## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| In re: | ) Chapter 7 |
| | ) |
| APPLIED MACHINERY RENTALS, LLC, | ) Case No. 23-30461 |
| AMR | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| COLE HAYES, CHAPTER 7 TRUSTEE | ) |
| FOR THE BANKRUPTCY ESTATE OF | ) Adv. Proc. No. 25-03130 |
| APPLIED MACHINERY RENTALS, | ) |
| LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| MACALLISTER MACHINERY CO., INC. | ) |
| d/b/a MACALLISTER CAT, | ) |
| | ) |
| Defendant. | ) |

## MACALLISTER MACHINERY CO. INC.'S ANSWER TO ADVERSARY COMPLAINT

Defendant MacAllister Machinery Co., Inc. d/b/a MacAllister CAT ("MacAllister"), by its undersigned attorneys, hereby answers the Complaint in the captioned proceeding and asserts its affirmative defenses as follows:

### Parties, Jurisdiction, and Venue

1.      **Plaintiff is the duly appointed, acting, and qualified Chapter 7 Trustee for the bankruptcy estate of Applied Machinery Rentals, LLC.**

**ANSWER**:  MacAllister admits.

2.      **Applied Machinery Rentals, LLC is the debtor in the bankruptcy case bearing Case Number 23-30461 ("Bankruptcy Case"), filed on July 17, 2023 ("Petition**

QB\99478728.1

Date"), and pending in the United States Bankruptcy Court for the Western District of North Carolina ("Court").

**ANSWER**:  MacAllister admits.

3.      **Defendant is an Indiana corporation.**

**ANSWER**:  MacAllister admits.

4.      **This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157 and 1334.**

**ANSWER**:  The allegations contained in paragraph 4 are legal conclusions and no answer is required; to the extent a response is required, MacAllister admits.

5.      **This matter is a core proceeding pursuant to 28 U.S.C. § 157.**

**ANSWER**:  The allegations contained in paragraph 5 are legal conclusions and no answer is required; to the extent a response is required, the statute speaks for itself. Otherwise, MacAllister denies.

6.      **Venue of this action is proper in this Court pursuant to 28 U.S.C. § 1409(a).**

**ANSWER**:  The allegations contained in paragraph 6 are legal conclusions and no answer is required; to the extent a response is required, the statute speaks for itself. Otherwise, MacAllister denies.

7.      **The statutory predicates for relief are 11 U.S.C. §§ 105, 363, 544, 547, 548, 550, and 551 as well as N.C. Gen. Stat. § 39-23.1 *et seq*., S.C. Code §§ 27- 23-10, *et seq*., and 28 U.S.C. § 3304 *et seq.***

**ANSWER**:  The allegations contained in paragraph 7 are legal conclusions and no answer is required; to the extent a response is required, the statutes speak for themselves. Otherwise, MacAllister denies all remaining allegations of paragraph 7.

8.      **Plaintiff commences this action under Rule 7001 of the Federal Rules of Bankruptcy Procedure.**

**ANSWER**:  The allegations contained in paragraph 8 are legal conclusions and no answer is required; to the extent a response is required, the rule speaks for itself. Otherwise, MacAllister denies.

9.      **Before bankruptcy, Debtor maintained its operations in Rock Hill, South Carolina.**

**ANSWER**:  MacAllister admits to the extent it understood Debtor maintained certain operation locations; MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the remaining allegations of paragraph 9 and, therefore, to the extent a

2

further response is required, MacAllister denies.

**10.     Before bankruptcy, Garth resided in Waxhaw, Union County, North Carolina.**

**ANSWER**:  MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 10 and, therefore, to the extent a further response is required, MacAllister denies.

## Factual Background

**11.     Debtor purported to be in the business of acquiring, distributing, leasing, and selling Merlo Telehandlers – an Italian hydraulic machine that is a combination tractor, forklift, and crane boom. The Debtor was previously the exclusive dealer of Merlo equipment in North America.**

**ANSWER**:  MacAllister admits to the extent it held itself out as a business that acquired, distributed and sold Merlo Telehandlers; MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the remaining allegations of paragraph 11 and, therefore, to the extent a further response is required, MacAllister denies.

**12.     Since its formation, Garth was the sole member, manager, and principal of the Debtor. Upon information and belief, Garth acted as president and CEO of the Debtor and exercised complete and unfettered dominion and control over its affairs and assets.**

**ANSWER**:  MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 12 and, therefore, to the extent a further response is required, MacAllister denies.

**13.     AMR's entire business model was based on fraud and illegal activity. Although AMR had a modest operation where it sold an occasional telehandler, parts, and did repair and warranty work, AMR had negligible legitimate rental income – an oddity for a company with "Rentals" in its name.**

**ANSWER**:  The allegations contained in paragraph 13 as to fraud and illegal activities are legal conclusions and no answer is required; further MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the remaining allegations of paragraph 13 and, therefore, to the extent a further response is required, MacAllister denies.

**14.     The "big money" that flowed in and out of AMR's bank accounts was orchestrated by Garth. Garth maintained an off-book portfolio for "friends and family" from which he ran the AMR Ponzi Scheme.**

**ANSWER**:  MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 14 and, therefore, to the extent a further response is required, MacAllister denies.

**15.     Stephanie Hofinga was the accountant at AMR from May 2021 to November**

**2022. On June 9, 2025, Ms. Hofinga testified that Garth had sole access to AMR's bank accounts and moved money between accounts constantly. Ms. Hofinga also testified that AMR's books were in complete disarray when she was hired, that Garth controlled all information about AMR's actual sales and leases, and getting information from him was difficult to impossible.**

**ANSWER**:  MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 15 and, therefore, to the extent a further response is required, MacAllister denies.

**16.     In 2022, Ms. Hofinga communicated extensively with Ms. Kim Smith of Burkett, Burkett & Burkett, Certified Public Accountants, P.A. in connection with an audit of AMR's books. Ms. Hofinga was asked in an email about "difficult accounts to decipher." Ms. Hofinga asked Garth about this and Garth said he entered into loans or investments or deals between business friends, separate from AMR's operations, and that did not involve the sale of telehandlers. Ms. Hofinga testified that those deals were part of Garth's separate portfolio and she was provided little to no information on them.**

**ANSWER**:  MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 16 and, therefore, to the extent a further response is required, MacAllister denies.

**17.     Ms. Hofinga also testified that Garth engaged in innumerable transactions where AMR purportedly sold a telehandler (often fake) to a friend of Garth, which was recorded as a sale in QuickBooks, then repurchased the same telehandler shortly thereafter and paid the friend a 10% fee to reacquire the equipment.**

**ANSWER**:  MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 17 and, therefore, to the extent a further response is required, MacAllister denies.

**18.     Garth ran the enterprise, which included the Debtor and related entities, with the intent to enrich himself and his family at the expense of the Debtor's creditors and, to that end, committed numerous criminal acts in furtherance of the enterprise.**

**ANSWER**:  The allegations contained in paragraph 18 are legal conclusions and no answer is required. MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the remaining allegations of paragraph 18 and, therefore, to the extent a further response is required, MacAllister denies.

**19.     Indeed, Garth used the Debtor to operate a Ponzi scheme (the "AMR Ponzi Scheme") from at least 2019 until Garth took his life in 2023.[1] He borrowed money from**

---

[1] A Ponzi scheme is a fraudulent pyramid-type scheme named after Charles Ponzi. *Cunningham v. Brown*, 265 U.S. 1 (1924). In such a scheme, money from new investors is used to pay artificially high returns to earlier investors in order to create an appearance of profitability and attract new investors so as to perpetuate the scheme. *See Bear Stearns Servs. Corp. v. Gredd*, 397 B.R. 1, 8-10 (S.D.N.Y. 2007) (citing *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1088 n.3 (2d Cir. 1995)); *see also In re: Unified Commercial Capital Inc.*, 260 B.R. 343 (Bankr. W.D.N.Y. 2001) ("A Ponzi scheme, as that term is generally used, refers to an investment scheme in which returns to investors

**various creditors on false pretenses and used loan proceeds from some creditors to keep others at bay and hide his fraud.**

**ANSWER**:  The allegations contained in paragraph 19 and referenced Footnote 1 are legal conclusions and no answer is required. To the extent that a response is required, the caselaw speaks for itself. MacAllister denies that the caselaw is applicable to the facts of this case. MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the remaining allegations of paragraph 19 and, therefore, to the extent a further response is required, MacAllister denies.

**20.    Garth also obtained loans to finance the import and purchase of Merlo Telehandlers. He represented and made assurances to lenders that AMR would purchase and then lease telehandlers to customers and use the lease payments to repay the loans. In reality, AMR had virtually no leasing operation.**

**ANSWER**:  MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 20 and, therefore, to the extent a further response is required, MacAllister denies.

**21.    Garth pledged telehandlers that did not exist and pledged the same telehandlers to multiple lenders representing that each lender had a first-priority lien.**

**ANSWER**:  MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 21 and, therefore, to the extent a further response is required, MacAllister denies.

**22.    Garth also sold the telehandlers "out of trust" to third parties without the lenders' knowledge or consent, and without remitting the sale proceeds to the lenders.**

**ANSWER**:  MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 22 and, therefore, to the extent a further response is required, MacAllister denies.

**23.    A core component of Garth's Ponzi scheme included inducing creditors to purchase telehandlers (that usually did not exist) at well below fair market value and then, without ever taking possession, lease the telehandlers back to AMR purportedly to be leased to other parties. This scheme allowed Garth to receive and return investments without having to physically deliver any equipment. These arrangements were a sham that permitted investors in the AMR Ponzi Scheme to be paid handsome returns.**

---

are not financed through the success of the underlying business venture, but are taken from principal sums of newly-attracted investments. Typically, investors are promised larger returns for their investments. Initial investors are actually paid the promised returns, which attracts additional investors."). There is a general rule - known as the "Ponzi scheme presumption" - that such a scheme demonstrates fraudulent intent as matter of law because "transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors." *Gredd*, 387 B.R. at 8-10; *see e.g., Donnell v. Kowell*, 533 F.2d 462, 770 (9th Cir. 2008); *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006); *SEC v. Resource Dev. Int'l, LLC*, 487 F.3d 295, 304 (5th Cir. 2007); *Armstrong v. Collins*, 2010 U.S. Dist. LEXIS 28075, at *63 (S.D.N.Y. 2010).

**ANSWER**:  The allegations contained in paragraph 23 are legal conclusions and no answer is required. MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the remaining allegations of paragraph 23 and, therefore, to the extent a further response is required, MacAllister denies.

24.     **In a variation on this maneuver, Garth exchanged fake invoices with investors where on paper it appeared AMR was selling telehandlers. But in reality, the invoices were a façade for an investment and a promised return – often 10% in 60-90 days. AMR paid the investment by "buying back" the telehandlers it sold at the 10% or greater markup. In most cases, the telehandlers never existed and in all cases they were never physically delivered or returned.**

**ANSWER**:  MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 24 and, therefore, to the extent a further response is required, MacAllister denies.

25.     **This fiction allowed Garth to create the appearance of solvency and profitability for AMR even though AMR never possessed anywhere near the number of telehandlers or achieved the profitability that Garth represented to AMR's creditors.**

**ANSWER**:  MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 25 and, therefore, to the extent a further response is required, MacAllister denies.

26.     **AMR's balance sheet listed millions in sales and receivables based on fake sales. The telehandlers either did not exist or they never changed hands and the buyers had to be paid back at a premium, making a receivable actually a liability.**

**ANSWER**:  MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 26 and, therefore, to the extent a further response is required, MacAllister denies.

27.     **AMR was insolvent as of year-end 2019, 2020, 2021, and 2022, and became more indebted as time passed. For the period ending December 31, 2019, the Debtor's liabilities exceeded its assets by over $26 million. For the period ending December 31, 2020, the Debtor's liabilities exceeded its assets by over $61 million. For the period ending December 31, 2021, the Debtor's liabilities exceeded its assets by over $78 million. For the period ending December 31, 2022, the Debtor's liabilities exceeded its assets by over $123 million. AMR also did business as Applied Machinery Sales ("AMS").**

**ANSWER**:  MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 27 and, therefore, to the extent a further response is required, MacAllister denies.

28.     **In reality, Garth ran a classic Ponzi scheme, using new purchase money / investments to repay the preexisting creditors and investors who previously bought into his scheme or to divert the cash to his family.**

6

**ANSWER**:  The allegations contained in paragraph 28 are legal conclusions and no answer is required. MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the remaining allegations of paragraph 28 and, therefore, to the extent a further response is required, MacAllister denies.

29.    **Garth used the proceeds to fund an extravagant lifestyle for himself and his family. He used the money AMR received for daily living expenses, numerous luxury vehicles, boats, beach houses, jewelry, expensive vacations, private jet travel, a plane, NFL tickets, and an all-around luxury lifestyle.**

**ANSWER**:  MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 29 and, therefore, to the extent a further response is required, MacAllister denies.

30.    **Garth also used the proceeds to enrich his friends, Matthew "Scott" Diggs and Paul Adkison. Diggs and Adkison were members of several LLCs whose corporate names include the phrase "Lift-It." Garth, through the Debtor, transferred over $71 million to the "Lift-It" entities, with millions of those funds going to Diggs and Adkison.**

**ANSWER**:  MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 30 and, therefore, to the extent a further response is required, MacAllister denies.

31.    **Diggs and Adkison, along with all the "Lift-It" entities and other parties, are defendants in a civil action filed on June 13, 2025 by First National Bank of Pennsylvania ("FNB") in the United States District Court for the Western District of North Carolina, Case Number 3:25-cv-00410. This Complaint alleges causes of action for Fraudulent Misrepresentations, Fraudulent Concealment, Negligent Misrepresentation, Violation of Racketeering Influenced and Corrupt Organizations Act (18 USC § 1961 et seq.), Conspiracy to Violate the Racketeer Influenced and Corrupt Organizations Act (18 USC § 1962(d)), Breach of Contract, Breach of Contract (Piercing the Protective Veil), Breach of Guaranty, Aiding and Abetting Fraud, Conspiracy to Commit Fraud, Fraudulence Conveyance (Actual Fraud), and Fraudulent Conveyance (Constructive Fraud).**

**ANSWER**:  MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 31 and, therefore, to the extent a further response is required, MacAllister denies.

32.    **The Lift-It entities were supposed to own – and represented to FNB that they used FNB loan proceeds to purchase and own – the same telehandlers that Garth purportedly was selling, leasing, re-selling, and doing lease-buybacks with through the Debtor.**

**ANSWER**:  MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 32 and, therefore, to the extent a further response is required, MacAllister denies.

33.    **Diggs and Adkison, through the Lift-It entities, represented to FNB that it**

owned hundreds of telehandlers purchased from AMR. This representation was materially false and made with either fraudulent intent or reckless indifference for the truth. Upon information and belief, they actually owned few–if any–of the telehandlers reported on their balance sheet. Indeed, many of the serial numbers for machines they represented they owned were fake or were for machines owned or encumbered by other parties.

**ANSWER**: MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 33 and, therefore, to the extent a further response is required, MacAllister denies.

34.     **Garth's criminal behavior masqueraded the fact that the Debtor's liabilities far exceeded its assets for at least four years before the Petition Date, perhaps since inception.**

**ANSWER**:  The allegations contained in paragraph 34 are legal conclusions and no answer is required. MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the remaining allegations of paragraph 34 and, therefore, to the extent a further response is required, MacAllister denies.

35.     **For at least four years before the Petition Date, AMR lacked revenue from legitimate business activities to pay its creditors.**

**ANSWER**: MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 35 and, therefore, to the extent a further response is required, MacAllister denies.

36.     **Garth commingled the funds Debtor received from creditors and investors.**

**ANSWER**:  MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 36 and, therefore, to the extent a further response is required, MacAllister denies.

### The Merlo Transfer

37.     **On June 1, 2023, Woodforest National Bank filed a Summons and Complaint along with a Notice of Motion and Motion for Appointment of Receiver against AMR and Garth in the York County, South Carolina Court of Common Pleas.**

**ANSWER**:  The allegations contained in paragraph 37 are legal conclusions and no answer is required. MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the remaining allegations of paragraph 37 and, therefore, to the extent a further response is required, the referenced documents speak for themselves; and MacAllister denies all remaining allegations.

38.     **A copy of the Summons and Complaint is attached and incorporated as Exhibit 1.**

**ANSWER**:  MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 38 and, therefore, to the extent a further

response is required, MacAllister provides that the referenced documents speak for themselves and MacAllister denies all remaining allegations.

**39.     A copy of the Notice of Motion and Motion for Appointment of Receiver is attached and incorporated as Exhibit 2.**

**ANSWER**:  The allegations contained in paragraph 39 are legal conclusions and no answer is required; to the extent a response is required, MacAllister provides that the referenced documents speak for themselves and MacAllister denies all remaining allegations.

**40.     On June 5, 2023, AMR and Garth were served with the Summons, Complaint, Notice of Motion, and Motion for Appointment of Receiver.**

**ANSWER**: MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 40 and, therefore, to the extent a further response is required, MacAllister denies.

**41.     Copies of the Affidavits of Service are collectively attached and incorporated as Exhibit 3.**

**ANSWER**: MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 41; to the extent a further response is required, the documents speak for themselves and MacAllister denies all remaining allegations.

**42.     On June 16, 2023, after a hearing on the Motion for Appointment of Receiver, the South Carolina Court entered an Order Appointing Receiver under South Carolina's Receivership Act appointing Matthew W. Smith of The Finley Group, Inc. as receiver ("Receiver") over the Assets and Operations (as defined in the Order) of AMR ("Order").**

**ANSWER**: The allegations contained in paragraph 42 are legal conclusions and no answer is required; to the extent a response is required, the Order speaks for itself. MacAllister admits that a receiver was appointed. MacAllister denies all remaining allegations.

**43.     A copy of the Order is attached and incorporated as Exhibit 4.**

**ANSWER**:  MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 43; to the extent a further response is required, the document speaks for itself. MacAllister denies all remaining allegations.

**44.     During this time, AMR arranged for and transferred to Defendant a Merlo Roto 50.35 S Plus telehandler bearing S/N ZF1RT30D1D1002008 ("Merlo 2008")(the "Merlo Transfer").**

**ANSWER**:  MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 44 and, therefore, to the extent a further response is required, MacAllister denies.

**45.     AMR engaged in this transaction at a time when it knew the Receiver had**

**Court-ordered control of AMR's Assets and Operations.**

**ANSWER**:  MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 45 and, therefore, to the extent a further response is required, MacAllister denies.

46.    **The Receiver did not authorize the transaction with Defendant, and the Merlo Transfer was in violation of the Order and applicable state law.**

**ANSWER**: MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 46 and, therefore, to the extent a further response is required, MacAllister denies.

47.    **Upon information and belief, Austin Bailey – AMR's Sales Manager and Garth's nephew – oversaw the Merlo Transfer.**

**ANSWER**:  MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 47 and, therefore, to the extent a further response is required, MacAllister admits to the extent that it understood that Austin Bailey was employed by AMR and denies all remaining allegations.

48.    **The Invoice documenting the Merlo Transfer indicates that Defendant paid nothing for the telehandler.**

**ANSWER**:  MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 48 and, therefore, to the extent a further response is required, the document speaks for itself and MacAllister denies all remaining allegations.

49.    **A copy of the Invoice is attached and incorporated as Exhibit 5.**

**ANSWER**:  MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 49 and, therefore, to the extent a further response is required, the document speaks for itself and MacAllister denies all remaining allegations.

50.    **The Invoice also indicates that Merlo 2008 had a fair-market value of $621,069.39.**

**ANSWER**:  MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 50 and, therefore, to the extent a further response is required, the document speaks for itself and MacAllister denies all remaining allegations.

51.    **The Invoice also states that, as part of the transaction, Defendant traded in a Merlo telehandler bearing S/N ZF1RT3D1D2001927 ("Merlo 1927"), for a trade-in value of $335,000.00 ("Trade-In").**

**ANSWER**:  MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 51 and, therefore, to the extent a further response is required, the document speaks for itself and MacAllister denies all remaining allegations.

52.     A combination of "dealer discount," "payment prior to shipment discount," "additional discount," and the Trade-In value resulted in the Invoice showing $0.00 paid by Defendant.

**ANSWER**:  MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 52 and, therefore, to the extent a further response is required, the document speaks for itself and MacAllister denies all remaining allegations.

53.     However, at the time of the Merlo Transfer, Defendant did not own or possess Merlo 1927. AMR did not own or take possession of the Merlo 1927 as a result of the Merlo Transfer.

**ANSWER**:  MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 53 and, therefore, to the extent a further response is required, MacAllister denies.

54.     Rather, upon information and belief, at the time of the Merlo Transfer, Russell Tree Experts Ltd. of Westerville, Ohio, was in possession of Merlo 1927 and believed that it owned Merlo 1927 by way of a warranty claim on a different, defective telehandler.

**ANSWER**:  MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 54 and, therefore, to the extent a further response is required, MacAllister denies.

55.     As a result, the $335,000 Trade-In credit for Merlo 1927 was wholly illusory and provided no benefit or value to AMR.

**ANSWER**:  The allegations contained in paragraph 55 are legal conclusions and no answer is required and MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the remaining allegations of paragraph 55 and, therefore, to the extent a further response is required, MacAllister denies.

56.     AMR delivered Merlo 2008 to Defendant in Indiana.

**ANSWER**: MacAllister admits to the extent that it received the Merlo 2008 in Indiana. MacAllister denies all remaining allegations.

57.     Defendant received Merlo 2008 in Indiana and has had the benefit and use of it ever since.

**ANSWER**: MacAllister admits to the extent it received the Merlo 2008. MacAllister denies all remaining allegations.

<u>The $200,000 Wire Transfer</u>

58.     On April 3, 2023, AMR wired $200,000 to Defendant ("Wire Transfer").

**ANSWER**:   MacAllister lacks knowledge or information sufficient to form a belief

11

regarding the truth of the allegations of paragraph 58 as to particulars; to the extent a further response is required, MacAllister admits to the extent it received $200,000 by a wire transfer on the identified date. MacAllister denies all remaining allegations.

59.    **The $200,000 Transfer was a payment pursuant to a scheme between AMR and Defendant where Defendant purchased telehandlers from AMR at deep discounts but never took possession.**

<u>**ANSWER**</u>:  The allegations contained in paragraph 59 are legal conclusions and no answer is required; therefore, to the extent a further response is required, MacAllister denies.

60.    **Instead, Defendant leased the telehandlers back to AMR at above-market rental rates.**

<u>**ANSWER**</u>:  The allegations contained in paragraph 60 are legal conclusions and no answer is required; therefore, to the extent that a further response is required, MacAllister denies.

61.    **AMR and Defendant exchanged invoices that purported to show that the telehandlers were delivered to Defendant in Indiana when they were not.**

<u>**ANSWER**</u>:  MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the remaining allegations of paragraph 61 and, therefore, to the extent a further response is required, MacAllister denies.

62.    **Upon information and belief, AMR – through Garth or Austin Bailey – dictated the terms of the purported lease-backs.**

<u>**ANSWER**</u>:  MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 62 and, therefore, to the extent that a further response is required, MacAllister denies.

63.    **Upon information and belief, the lease-backs deviated from the industry standards and norms for the rental of comparable equipment.**

<u>**ANSWER**</u>:  The allegations contained in paragraph 63 are legal conclusions and no answer is required and MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the remaining allegations of paragraph 63 and, therefore, to the extent a further response is required, MacAllister denies.

64.    **The $200,000 Transfer represented ill-gotten gains as a result of Garth's fraudulent conduct and to which Defendant has no legitimate claim.**

<u>**ANSWER**</u>:  The allegations contained in paragraph 64 are legal conclusions and no answer is required and MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the remaining allegations of paragraph 64 and, therefore, to the extent a further response is required, MacAllister denies.

65.    **The lease-back deals between Defendant and Garth were actually short-term**

**investments at high rates of return fraudulently papered to look like the rental of equipment.**

**ANSWER**: The allegations contained in paragraph 65 are legal conclusions and no answer is required and MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the remaining allegations of paragraph 65 and, therefore, to the extent a further response is required, MacAllister denies.

66.     **The transactions made no business sense for AMR.**

**ANSWER**:   MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 66 and, therefore, to the extent a further response is required, MacAllister denies.

67.     **Defendant never took physical possession of the telehandlers under the lease-backs and, upon information and belief, never insured these telehandlers, listed them as assets on their balance sheet, or depreciated them for tax purposes.**

**ANSWER**:  MacAllister denies.

68.     **The fraudulent documents papering the transactions had a multifold effect: (1) they disguised the true nature of the transactions, (2) they allowed Garth to falsify company records to give them the illusion that AMR was engaged in legitimate, profitable sales of equipment, and (3) they allowed Garth to continue to pay other creditors and investors and represent to victims that AMR was a thriving and legitimate business operation.**

**ANSWER**:  The allegations contained in paragraph 68 are legal conclusions and no answer is required and MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the remaining allegations of paragraph 68 and, therefore, to the extent a further response is required, MacAllister denies.

69.     **Defendant's knowing and voluntarily participation in this deception allowed Garth to continue running the AMR Ponzi Scheme and victimizing AMR's creditors.**

**ANSWER**:  MacAllister denies.

70.     **Upon information and belief, Defendants conducted little to no due diligence before entering into each transaction with AMR.**

**ANSWER**:  MacAllister denies.

71.     **Upon information and belief, Defendant failed to file UCC-1 Financing Statements to perfect any alleged security interest in the telehandlers**.

**ANSWER**:  MacAllister denies.

72.     **Upon information and belief, Defendant never inspected any telehandler under the lease-backs, nor did it attach any GPS tracking device to any of the telehandlers.**

13

**ANSWER**:  MacAllister admits that it did not place GPS tracking devices on telehandlers. MacAllister denies all remaining allegations.

73.    **Upon information and belief, Defendant never inquired with Garth or anyone at AMR about why AMR, as the exclusive importer of Merlo in the United States, needed to lease telehandlers from Defendant.**

**ANSWER**:  MacAllister denies.

74.    **The payments from Defendant to AMR, combined with the leaseback deals, were actually investments in the AMR Ponzi Scheme.**

**ANSWER**:  The allegations contained in paragraph 74 are legal conclusions and no answer is required; to the extent a further response is required, MacAllister denies.

75.    **Garth used the investments from Defendant to further the AMR Ponzi scheme.**

**ANSWER**:   MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 75 and, therefore, to the extent a further response is required, MacAllister denies.

76.    **The $200,000 Transfer was an individual and discrete transfer of property of the Debtor.**

**ANSWER**: MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 76 and, therefore, to the extent a further response is required, MacAllister denies.

77.    **The AMR Ponzi Scheme involved negligible legitimate or actual business activity by AMR. For a company that supposedly engaged in rentals and sales of Merlo Telehandlers, AMR had negligible legitimate rental or sales income.**

**ANSWER**: MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 77 and, therefore, to the extent a further response is required, MacAllister denies.

78.    **There was no reasonable basis for Defendant to believe that AMR was engaged in legitimate business through these transactions or that any representations by Garth about AMR were truthful.**

**ANSWER**:  MacAllister denies.

79.    **Upon information and belief, Defendant received the $200,000 Transfer with knowledge of fraud at AMR, or with willful blindness to circumstances suggesting a high probability of fraud at AMR.**

**ANSWER**: MacAllister denies.

14

80.    The Merlo Transfer and the $200,000 Transfer are collectively the "Transfers."

**ANSWER**:  MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 80 and, therefore, to the extent a further response is required, MacAllister denies.

81.    Each of the Transfers are avoidable and recoverable under sections 548 and 550 of the Bankruptcy Code.

**ANSWER**:  The allegations contained in paragraph 81 are legal conclusions and no answer is required; to the extent a further response is required, MacAllister denies.

82.    The Trustee's investigation is ongoing, and the Trustee reserves the right to (i) supplement the information on the Transfers and any additional transfers and (ii) seek recovery of such additional transfers.

**ANSWER**:  MacAllister admits to the extent it is permitted by law and denies any remaining allegations to the contrary.

## FIRST CLAIM FOR RELIEF
### Avoidance of Transfers – Actual and Constructive Fraud 11 U.S.C. §§ 548 and 550

83.    Plaintiff incorporates by reference all previous allegations.

**ANSWER**:  For its answer to the allegations of paragraph 83, MacAllister restates and incorporates by reference its answers to all preceding allegations in the Complaint.

84.    The Transfers each represent transfers of property of the Debtor to the Defendants.

**ANSWER**:  The allegations contained in paragraph 84 are legal conclusions and no answer is required; to the extent a further response is required, MacAllister denies.

85.    The Transfers each were made while the Debtor was insolvent.

**ANSWER**:  The allegations contained in paragraph 85 are legal conclusions and no answer is required; to the extent a further response is required, MacAllister denies.

86.    The Debtor received less than reasonably equivalent value in exchange for each of the Transfers.

**ANSWER**:  The allegations contained in paragraph 86 are legal conclusions and no answer is required; to the extent a further response is required, MacAllister denies.

87.    The Transfers each were made with the intent to hinder, delay, or defraud a creditor or an officer of the Debtor's bankruptcy estate.

**ANSWER**:  The allegations contained in paragraph 87 are legal conclusions and no answer

15

is required; to the extent a further response is required, MacAllister denies.

**88.    The Transfers each were made in furtherance of the AMR Ponzi Scheme and for Garth to use Debtor funds and assets to enrich himself and his family at the expense of Debtor's creditors.**

<u>**ANSWER**</u>:  The allegations contained in paragraph 88 are legal conclusions and no answer is required; to the extent a further response is required, MacAllister denies.

**89.    The following badges of fraud are applicable to each of the Transfers and existed at the time each of the Transfers were made:**

**a.    <u>Insolvency on the part of the Debtor</u>. AMR lacked the funds to pay its creditors and its liabilities continued to grow during its dealings with Defendants.**

**b.    <u>Concealment</u>. Garth and Defendants exchanged fake invoices. These invoices were designed to make it appear as though (i) actual telehandlers were being purchased or sold, despite Defendants never taking physical possession, or (ii) actual telehandlers were being rented or "re-rented" between AMR and Defendant. The invoices were simply a cover for the transfer of large sums of money between AMR for no legitimate business purpose. These documents were used to conceal the true financial reality of AMR.**

**c.    <u>Possession or control of property</u>. AMR rarely physically delivered telehandlers to investors in the AMR Ponzi Scheme, which was operating at the time of the Transfers. AMR continued to structure Ponzi scheme payments as sales of phantom telehandlers or payments under lease-back deals.**

**d.    <u>Pending litigation</u>. Litigation was pending or threatened against AMR at the time of the Transfers.**

**e.    <u>Transfer and removal of assets</u>. When AMR made the Transfers, Garth transferred funds from AMR to personally benefit himself, his friends, and his family.**

**f.    <u>Absconding with the funds</u>. While Garth did not abscond with any funds, he did commit suicide in 2023 when the AMR Ponzi Scheme unraveled.**

**g.    <u>Garth's business acumen</u>. Garth was a sophisticated businessman with significant experience in the heavy equipment industry. He knew exactly what he was doing when AMR made the Transfers.**

**h.    <u>Garth's lack of credibility</u>. A party's lack of credibility is a badge of fraud. Garth died by suicide before he could be questioned about these transactions, but the scope of his fraud makes any attempt to legitimize his dealings with Defendant wholly lacking in credibility.**

**i.    <u>Garth's total control of AMR</u>. During all relevant time periods and when AMR made the Transfers, Garth controlled AMR absolutely. On multiple occasions he took cash from AMR without consideration to repay other Ponzi scheme debts. AMR was integral to**

16

the conduct and continuation of the Ponzi scheme. Although it lost significant money every year, AMR was nevertheless made to appear profitable and self-sustaining so Garth could trumpet its success and make claims about its business to potential investors, who would then make loans or investments at outrageously-high interest rates to AMR to further the Ponzi scheme.

j.      **Lack of reasonably equivalent value**. AMR did not receive reasonably equivalent value in exchange for the Transfers.

k.      **Criminal conduct**. When AMR made the Transfers, AMR and Garth were engaged in multiple criminal acts intended to defraud creditors, and these acts included the looting of the AMR's assets for Garth's family's personal gain.

**ANSWER**: The allegations contained in paragraph 89a-k are legal conclusions and no answer is required. MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 89a-k; and, therefore, to the extent a further response is required, MacAllister denies.

92.      **The Transfers each were made pursuant to the AMR Ponzi Scheme[2]**

**ANSWER**: The allegations contained in paragraph 92 are legal conclusions and no answer is required. MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 92 and, therefore, to the extent a further response is required, MacAllister denies.

93.      **The Debtor's estate has been diminished in the amount of the Transfers.**

**ANSWER**: The allegations contained in paragraph 93 are legal conclusions and no answer is required. MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 93 and, therefore, to the extent a further response is required, MacAllister denies.

94.      **Upon information and belief, the Debtor was a net winner in the AMR Ponzi Scheme as a result of the Transfers.**

**ANSWER**: MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 94 and, therefore, to the extent a further response is required, MacAllister denies.

95.      **The remaining assets of the Debtor's estate are insufficient to pay the estate's debts and liabilities, including the claims of creditors who were not "net winners" in the AMR Ponzi Scheme.**

**ANSWER**: MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 95 and, therefore, to the extent a further response

---

[2]      The numbered paragraphs in the Complaint are inconsistent. This Answer tracks the numbering listed in the Complaint.

is required, MacAllister denies.

96.    **For these reasons, the Transfers should be avoided.**

**ANSWER**: MacAllister repeats and realleges its responses to the paragraphs above; and therefore, to the extent a response is required, MacAllister denies.

97.    **Plaintiff also is entitled to a judgment against Defendants as the initial transferee, or as the immediate or mediate transferees of an initial transferee in an amount to be proven at trial.**

**ANSWER**:  The allegations contained in paragraph 97 are legal conclusions and no answer is required; to the extent a further response is required, MacAllister denies.

98.    **Plaintiff also is entitled to recover each of the Transfers or their value from Defendants under Section 550.**

**ANSWER**:  The allegations contained in paragraph 98 are legal conclusions and no answer is required; to the extent a further response is required, MacAllister denies.

**SECOND CLAIM FOR RELIEF**
**Avoidance of Preference Period Transfer - 11 U.S.C. § 547**

90.    **Plaintiff incorporates by reference all previous allegations.**

**ANSWER**: For its answer to the allegations of paragraph 90, MacAllister restates and incorporates by reference its answers to all preceding allegations in the Complaint.

91.    **As an alternative to the First Claim for Relief, Plaintiff brings this Second Claim for Relief as to the Merlo Transfer.**

**ANSWER**:  The allegations contained in paragraph 91 are legal conclusions and no answer is required; to the extent a further response is required, MacAllister denies.

92.    **On November 28, 2023, Defendant filed Proof of Claim No. 95 in the Bankruptcy Case for $420,327.22 ("Claim 95").**

**ANSWER**:  MacAllister admits.

93.    **Claim 95 purports to be for "unpaid prepetition charges for rental, pick-up, and repair of certain Equipment," and "late fees arising" under the respective Leases.**

**ANSWER**:  The referenced claim speaks for itself; to the extent a response is required, MacAllister denies the allegation that "purports"; admits to the statements presented in the Claim and denies any remaining allegations.

94.    **The invoices referenced in Claim 95 are dated between March 8, 2023 and November 27, 2023.**

18

**ANSWER**:  The referenced claim speaks for itself; to the extent a response is required, MacAllister admits to the invoices referenced in the Claim.

**95.**     **The Merlo Transfer is a transfer of property of the Debtor to the Defendant.**

**ANSWER**:  The allegations contained in paragraph 95 are legal conclusions and no answer is required; to the extent a further response is required, MacAllister denies.

**96.**     **At the time, Defendant contended that Debtor was behind on its rent payments under the lease-back deals.**

**ANSWER**:  MacAllister lacks knowledge or information as to the date, time contended of paragraph 96. MacAllister admits to extent the paragraph purports that AMR owed payments to MacAllister and MacAllister denies all remaining allegations.

**97.**     **Upon information and belief, AMR and Defendant engaged in the Merlo Transfer as partial payment for claims asserted by Defendant against AMR as represented by Claim 95.**

**ANSWER**:  MacAllister denies.

**98.**     **If Defendant has a valid claim as a creditor of AMR, then the Merlo Transfer was made to or for the benefit of the Defendant as a creditor.**

**ANSWER**:  The allegations contained in paragraph 98 are legal conclusions and no answer is required, to the extent a response is required, MacAllister admits to the extent it was a creditor of AMR and denies all remaining allegations.

**99.**     **If Defendant has a valid claim as a creditor of AMR, then the Merlo Transfer was made on account of an antecedent debt owed by the Debtor before such transfers were made.**

**ANSWER**:  The allegations contained in paragraph 99 are legal conclusions and no answer is required; to the extent a further response is required, MacAllister denies.

**100.**     **The Merlo Transfer was made while the Debtor was insolvent.**

**ANSWER**:  The allegations contained in paragraph 100 are legal conclusions and no answer is required. MacAllister lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of paragraph 100 and, therefore, to the extent a further response is required, MacAllister denies.

**101.**     **The Merlo Transfer was made within 90 days of the Petition Date.**

**ANSWER**:  MacAllister lacks knowledge or information as to the date, time contended of paragraph 101; therefore, to the extent a response is required, MacAllister denies.

**102.**     **Defendant received more from the Merlo Transfer than it would receive in this**

**Chapter 7 case had it not received it.**

**ANSWER**: The allegations contained in paragraph 102 are legal conclusions and no answer is required; to the extent a further response is required, MacAllister denies.

103.    **The Trustee reviewed the Debtor's records and the limited records provided by Defendant pursuant to a Rule 2004 subpoena. The Trustee, through counsel, communicated with counsel for Defendant over several months seeking additional information about the Transfers. The Trustee also carefully examined and considered Defendant's potential defenses to avoidance under 547 and 548. The Trustee concluded that Defendant has no viable and provable defense to this Claim for Relief.**

**ANSWER**: MacAllister admits to the extent it received formal and informal document demands; and admits that it worked with counsel for the Trustee to provide requested information; MacAllister lacks knowledge and information as to the actions and conclusions taken by the Trustee; and to the extent a further response is required, MacAllister denies all remaining allegations of paragraph 103.

104.    **For these reasons, the Merlo Transfer should be avoided.**

**ANSWER**: The allegations contained in paragraph 104 are legal conclusions and no answer is required; to the extent a further response is required, MacAllister repeats and realleges its responses to the paragraphs above and denies.

105.    **Plaintiff also is entitled to a judgment against Defendant as the initial transferee, or as the immediate or mediate transferees of an initial transferee, in an amount to be proven at trial.**

**ANSWER**: The allegations contained in paragraph 105 are legal conclusions and no answer is required; to the extent a further response is required, MacAllister denies.

106.    **Plaintiff also is entitled to recover the Merlo Transfer or its value from Defendant under Section 550.**

**ANSWER**: The allegations contained in paragraph 106 are legal conclusions and no answer is required; to the extent a further response is required, MacAllister denies.

**THIRD CLAIM FOR RELIEF**
**(Claim Block – 11 U.S.C. § 502(d))**

107.    **Plaintiff incorporates by reference all previous allegations.**

**ANSWER**: For its answer to the allegations of paragraph 107, MacAllister restates and incorporates by reference its answers to all preceding allegations in the Complaint.

108.    **Defendant filed Claim 95.**

**ANSWER**:  MacAllister admits.

20

**109.    Defendant is the recipient of avoidable transfers under 11 U.S.C. § 547 and 548.**

**ANSWER**: The allegations contained in paragraph 109 are legal conclusions and no answer is required; to the extent a further response is required, MacAllister denies.

**110.    Defendant has not paid the amount, or turned over any property, for which it is liable under 11 U.S.C. § 550.**

**ANSWER**: The allegations contained in paragraph 110 are legal conclusions and no answer is required; to the extent that a further response is required, MacAllister denies.

**111.    Pursuant to 11 U.S.C. § 502(d), Plaintiff is entitled to an order and judgment disallowing Claim 95.**

**ANSWER**: The allegations contained in paragraph 111 are legal conclusions and no answer is required; to the extent a further response is required, MacAllister denies.

**FOURTH CLAIM FOR RELIEF**
**(Claim Objection / Equitable Subordination –11 U.S.C. §§ 502(b), 510, and 544(a))**

**112.    Plaintiff incorporates by reference all previous allegations.**

**ANSWER**: For its answer to the allegations of paragraph 112, MacAllister restates and incorporates by reference its answers to all preceding allegations in the Complaint.

**113.    Claim 95 should be disallowed in this case.**

**ANSWER**:  MacAllister denies.

**114.    Alternatively, the Court should equitably subordinate Claim 95 to the claims of all other creditors with allowed claims pursuant to 11 U.S.C. § 510.**

**ANSWER**: The allegations contained in paragraph 114 are legal conclusions and no answer is required; to the extent a further response is required, MacAllister denies.

**115.    Based on the allegations, Claim 95 should be disallowed, in whole or in part, or equitably subordinated.**

**ANSWER**:  The allegations contained in paragraph 115 are legal conclusions and no answer is required; to the extent a further response is required, MacAllister denies.

WHEREFORE, Plaintiff prays that:

1.    The Court enter a temporary restraining order, preliminary injunction, and permanent injunction directing Defendant to not transfer, assign, dispose, or sell any funds or assets obtained from the Debtor, directly or indirectly, or, in the value of such property, until further hearing.

21

2.      That on its First and Second Claims for Relief, the Court avoid the Transfers in an amount to be proven at trial.

3.      That on its First and Second Claims for Relief, Plaintiff recover the value of the Transfers from Defendant.

4.      That on its First and Second Claim for Relief, the Court enter judgment awarding damages to Plaintiff in an amount to be proven at trial.

5.      That on its Third Claim for Relief, the Court enter an order and judgment disallowing Claim 95.

6.      That on its Fourth Claim for Relief, the Court equitably subordinate Claim 95 to the claims of all other creditors with allowed claims.

7.      That the Court, if necessary, impose a constructive trust or equitable lien, or both, on all assets traceable to the Transfers.

8.      That the Court grant the Plaintiff such other and further relief as the Court deems just and proper.

**ANSWER**: MacAllister objects to the relief prayed for in the Complaint.

## AFFIRMATIVE DEFENSES

All of the following affirmative defenses are asserted in the alternative, and the assertion of one affirmative defense is not intended to negate the right or ability of MacAllister to assert any other affirmative defense, whether in this Answer or in any amendment thereto.

### First Affirmative Defense – Statute of Limitations (11 U.S.C. § 546(c)(1))

1.      The commencement of a voluntary chapter 7 case by each Debtor constituted an order for relief as to that Debtor entered on the Petition Date.

2.      Pursuant to 11 U.S.C. § 546(a), an action or proceeding under 11 U.S.C. §§ 544, 545, 547, 548, or 553 may not be commenced in the Debtors' cases after July 17, 2025.

3.      Plaintiff is therefore prohibited from amending the Complaint to include any transfers not already included therein, because such an amendment would be the equivalent of commencing a proceeding under 11 U.S.C. §§ 547 or 548 (as applicable) that is time-barred under 11 U.S.C. § 546(a).

QB\99478728.1

### Second Affirmative Defense – 11 U.S.C. § 547(c)(1)

1.      Upon information and belief, and to preserve this affirmative defense for

MacAllister, MacAllister states that certain of the transfers that MacAllister has admitted to

receiving and that comprise the transfers were or may have been (a) intended by the relevant

Debtor and MacAllister to be contemporaneous exchanges for new value and (b) in fact,

substantially contemporaneous exchanges.

2.      Plaintiff may not recover any such transfers from MacAllister, pursuant to 11

U.S.C. § 547(c)(1).

### Third Affirmative Defense – 11 U.S.C. § 547(c)(2)(A)

1.      Some or all of the transfers that MacAllister has admitted to receiving and that

comprise the transfers were each made (a) in payment of a debt incurred by the relevant Debtor

in the ordinary course of the business or financial affairs of the Debtor and MacAllister and (b)

in the ordinary course of business or financial affairs of such Debtor and MacAllister.

2.      Plaintiff may not recover any such transfers from MacAllister, pursuant to 11

U.S.C. § 547(c)(2)(A).

### Fourth Affirmative Defense – 11 U.S.C. § 547(c)(2)(B)

1.      Some or all of the transfers that MacAllister has admitted to receiving and that

comprise the transfers were each made (a) in payment of a debt incurred by the relevant Debtor

in the ordinary course of the business or financial affairs of the Debtor and MacAllister and (b)

according to ordinary business terms.

2.      Plaintiff may not recover any such transfers from MacAllister, pursuant to 11

U.S.C. § 547(c)(2)(B).

QB\99478728.1

## Fifth Affirmative Defense – 11 U.S.C. § 547(c)(4)

1.      Some or all of the transfers that MacAllister has admitted to receiving and that comprise the transfers are or may be subject to reduction on account of new value provided to the relevant Debtor by MacAllister after such transfers were made (a) which new value was not secured by an otherwise unavoidable security interest and (b) on account of which new value MacAllister did not receive an otherwise unavoidable transfer to or for its benefit from the relevant Debtor.

2.      Plaintiff may not recover any such transfers from MacAllister, pursuant to 11 U.S.C. § 547(c)(4).

## Sixth Affirmative Defense – Failure to Establish
## Essential Element of Cause of Action (11 U.S.C. § 547(b)(2))

1.      Certain of the transfers that MacAllister has admitted to receiving and that comprise the transfers were not made on account of antecedent debts owed by any Debtor to MacAllister before such transfers were made but, rather, were made prior to, or at, the time such debts arose.

2.      Plaintiff may not recover any such transfers from MacAllister, because, as to those transfers, Plaintiff cannot satisfy 11 U.S.C. § 547(b)(2).

## Seventh Affirmative Defense – Failure to Establish
## Essential Element of Cause of Action (11 U.S.C. § 548(a)(1)(B)(i))

1.      For each of the transfers that MacAllister has admitted to receiving and that comprise the transfers, the relevant Debtor received at least reasonably equivalent value therefore.

2.      Plaintiff may not recover any such transfers from MacAllister as constructive fraudulent transfers under 11 U.S.C. § 548(a)(1)(B), because Plaintiff cannot satisfy 11 U.S.C.

24

§ 548(a)(1)(B)(i).

## Eighth Affirmative Defense – 11 U.S.C. § 548(c)

1.      As to each of the transfers that MacAllister has admitted to receiving and that
comprise the Transfers that may be avoidable as constructive fraudulent transfers under 11
U.S.C. § 548(a)(1)(B), MacAllister took such transfer (a) for value given and (b) in good faith.

2.      As to any such avoided transfer, MacAllister is entitled to its full rights and
protections under 11 U.S.C. § 548(c), including (a) a lien on, or retention of, the interest
transferred to MacAllister or (b) enforcement of any obligation to MacAllister that is avoided,
each to the extent of the value given to the relevant Debtor in exchange for such transfer or
obligation.

## Nineth Affirmative Defense – Fed. R. Civ. P. 12(b)(6)

1.      The Debtor has failed to allege facts with sufficient plausibly that, if proven,
establish the requisite elements for avoidance and recovery of fraudulent transfers under § 548 of
the Bankruptcy Code or North Carolina law. As a result, these claims must be dismissed
pursuant to Fed. R. Civ. P. 12(b)(6), made applicable to this adversary proceeding by Fed. R.
Civ. P. 7012, for failure to state claims upon which relief may be granted.

## Tenth Affirmative Defense – 11 U.S.C. § 550(b)

1.      As to each of the transfers that MacAllister has admitted to receiving and that
comprise the Transfers that may be avoidable as constructive fraudulent transfers under 11
U.S.C. § 548(a), MacAllister took such transfer (a) for value given and (b) in good faith.

2.      As to any such avoided transfer, the Trustee may not recover any of the Transfers
under 11 U.S.C § 550(b).

QB\99478728.1

## Eleventh Affirmative Defense – In Pari Delicto

1.      The Trustee's claims are barred, in whole or in part, by the doctrines of in pari

delicto, unclean hands, and estoppel, as the Trustee alleges in the Complaint that the Debtor's

own principals engaged in wrongdoing that are the premise for various claims against

Defendants.

## Twelfth Affirmative Defense – Reservation of Rights

MacAllister hereby reserves all of its rights to (a) assert counterclaims against Plaintiff,

any Debtor or group of Debtors, the property of any Debtor or group of Debtors, and the estates

of any Debtor or group of Debtors; (b) assert additional affirmative defenses that may appear

during the course of the captioned proceeding, and (c) amend the above answers and these

affirmative defenses.

WHEREFORE, Defendant MacAllister respectfully requests that this Court (A) deny

Plaintiff any and all relief Plaintiff seeks against MacAllister and (B) grant MacAllister such

other and further relief as this Court deems appropriate.

QB\99478728.1

Dated: December 12, 2025

> **BAKER, DONELSON, BEARMAN,**
> **CALDWELL & BERKOWITZ, PC**
>
> By:   /s/ Jill C. Walters
>       Jill C. Walters
>       NC State Bar No. 37121
>       2235 Gateway Access Point
>       Suite 220
>       Raleigh, North Carolina 27607
>       Telephone: 984.844.7919
>       Email: jwalters@bakerdonelson.com
>
>       *Attorneys for Defendant*
>
>
>       and
>
> **QUARLES & BRADY LLP**
>
> /s/ Brittany S. Ogden
> Brittany S. Ogden (SBN 1035853)
> 33 East Main St., Suite 900
> Madison, WI 53703
> Telephone: (608) 251-5000
> Email: brittany.ogden@quarles.com
>
> *Attorneys for Defendant – Pro Hac Vice*
> *Motion pending*

<u>CERTIFICATE OF SERVICE</u>

I, the undersigned, of Baker, Donelson, Bearman, Caldwell & Berkowitz, PC certifies:

That I am, and at all times hereinafter mentioned was, more than eighteen (18) years of age;

That on this day, the foregoing Answer was served by electronic means through the court's CM/ECF service on:

Cole Hayes
*Chapter 7 Trustee for the Bankruptcy Estate of Applied Machinery Rentals, LLC*

Lance P. Martin
*Attorney for Chapter 7 Trustee*

Thomas C. Wolff
*Attorney for Chapter 7 Trustee*

United States Bankruptcy Administrator – WDNC

Dated:  December 12, 2025

BAKER, DONELSON, BEARMAN,
 CALDWELL & BERKOWITZ, PC


By:   /s/ Jill C. Walters
      Jill C. Walters
      NC State Bar No. 37121
      2235 Gateway Access Point
      Suite 220
      Raleigh, North Carolina 27607
      Telephone: 984.844.7919
      Email: jwalters@bakerdonelson.com

      *Attorneys for Defendant*

QB\99478728.1